Filed 12/19/25  P. v. Whatley CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>GERELL LEE WHATLEY,<br><br>      Defendant and Appellant. | C101493<br><br>(Super. Ct. Nos.<br>STKCRFE20090005430,<br>SF110732B) |

Over the course of several days in October 2008, defendant Gerrell Lee Whatley and codefendant Joel Ladon Lewis committed numerous armed robberies in Stockton during which they assaulted, robbed, and shot at multiple victims, killing one.  Defendant appeals the trial court's order denying his Penal Code section 1172.6 petition for resentencing on one count of murder and four counts of attempted murder following an evidentiary hearing.[1]  He also challenges the originally imposed fines and fees on ability

---

[1]  Undesignated statutory references are to the Penal Code.

1

to pay and due process grounds, and asserts his trial counsel was ineffective for failing to object to the fines.  We shall affirm.

## I.  BACKGROUND

At the section 1172.6 evidentiary hearing, the parties relied on the original trial record and neither party presented new evidence.

*A.      The Evidence at Trial*

In July 2008, Adrienne W. reported that two Black men in a green Jeep Cherokee drove past her house and the passenger pointed a gun or rifle at her.  Police pulled over defendant and Lewis in defendant's green Jeep Cherokee, and Adrienne positively identified Lewis as the passenger with the gun and defendant as the driver.  A rifle, a magazine, and two .9 millimeter shell casings were located under the driver's side backseat of defendant's car.

Three months later, on October 16, 2008, Margarito L. returned to his home around 10:45 p.m.  He saw a car drive past his house and turn into an adjacent alleyway where he heard the car's engine turn off.  A few minutes later, two Black men dressed in dark clothing and wearing ski masks surrounded him on his driveway.  One man pointed a gun at his head and said it was a "robbery."  The other man also pointed a gun at Margarito and blocked his way to his garage.  The men hit him in the head and face as he tried to escape into his house.  The robbers took his wallet from his pocket and fled.  During the attack, the ski mask of the robber who removed Margarito's wallet from his pocket fell off and was recovered at the scene.  Shortly thereafter, Margarito heard a gunshot nearby and then he heard a car start up and speed off.

Margarito's son saw him get robbed.  One of the men pointed a gun at the son and yelled at him to go inside and get more money.  The son described the gun as "black" and "not a revolver," and said it looked like the kind a police officer would carry.  He reported hearing at least two gun shots after the men had fled.  The son later picked out

2

codefendant Lewis from a six-pack photographic lineup as the man who pointed the gun at him, and identified Lewis at trial.

Cynthia B. lived down the alleyway behind Margarito's house. While walking down the alley about 10:45 p.m. that night, she heard footsteps behind her and turned and saw a silver car with two doors open parked in the alley near Margarito's gate. She saw two men attempting to enter the car and then heard one man say, " 'Shoot her. Shoot her.' " Someone immediately fired multiple shots at her, and she turned and ran in the opposite direction. A .9-millimeter Luger shell casing was recovered from the alley.

The next night, on October 17, 2008, Peter C. arrived home around 10:30 p.m. and two men wearing black clothing suddenly appeared as he walked towards his house. One of the men pointed a black semi-automatic handgun at him and they demanded money. They took his wallet with $600 and his credit cards as well as his cell phone and fled. Peter chased them, and the men hopped into a silver car and fired several shots. Police recovered three shell casings from the scene: two .9 millimeter shell casings and one .9 millimeter Luger shell casing.

About an hour later, around 11:30 p.m., Peter's stolen credit card was used to purchase gas at a Shell station. Officers later recovered a receipt for the gas purchase under the driver's seat of a gold Dodge Stratus. Codefendant Delisa Bryant owned that car, and defendant drove it during the relevant time period. Surveillance video showed defendant arriving at the gas station in the Stratus and filling up another vehicle while kissing his then-girlfriend. She owned a silver Saturn that could be seen in the gas station video, and codefendant Lewis was also present in the video.

On October 18, 2008, Armando C., Baltazar C., Javier G., and Jose G., were hanging out and drinking beer around 10:00 p.m. in the driveway of Baltazar's house, which was located near defendant's grandfather's house. While in the driveway, three Black men robbed and assaulted the group.

3

Armando saw three Black men wearing black hooded sweatshirts walk by on the street. Armando then heard a gunshot and got up to see what had happened. Someone immediately yelled at him to get on the ground, demanded his money, and took his cell phone and about $70 from his pockets. Armando saw two other robbers chasing two of his friends, and he noticed that Javier had been shot in the street.

Baltazar was standing between two cars in the driveway when two or three Black men in dark hooded sweatshirts wearing black masks suddenly appeared and demanded money; one pointed a gun at them. Baltazar was hit in the face. He tried to escape to the backyard, but a robber followed and shoved him to his stomach on the ground. The robber searched his back pockets but did not find his wallet in his front pocket. The robbers eventually fled out the backyard.

Javier had gone to change the music in his car near the street when he turned around and saw a Black man dressed in a dark hooded sweater and with his face covered holding a gun. The man said something in English, which Javier did not understand, and as Javier tried to pass him, he shot Javier in the abdomen. Police recovered a single .9-millimeter Luger shell casing from the scene.

Jose saw at least three Black men wearing dark clothing and black masks walk by on the street when the men suddenly approached; one man had a gun. He and Baltazar ran towards the backyard and two robbers followed them. One robber pointed at gun at Jose's head and demanded money. Jose handed the robber his wallet with his money and credit cards; the robber then struck him twice in the head with the gun and fled over the backyard fence.

Baltazar's neighbor and her son were returning home when they saw a Black man wearing a black ski mask coming from Baltazar's backyard. The neighbor identified defendant in a six-pack photographic lineup as the man she saw, and her son said defendant looked like the man he saw.

4

Two days later, on October 20, 2008, Francis S. was working on his car in his driveway (located only a few blocks from Baltazar's home) around 7:45 p.m. when two Black men with their faces partially covered suddenly appeared on either side of him. One man yelled, " 'Give me your money nigga,' " as he pointed a gun that appeared to have a silver tip in Francis's face. The other man reached into Francis's pockets and removed his wallet and keys, giving the wallet to the man with the gun. The man with the gun demanded his PIN number for his credit cards, but Francis said he did not know the number. The other man told the man with the gun, " 'Let's just go. Let's just go,' " and the two men then walked away down the street. Francis thought he saw a third person standing near the front of his car, but his view was obstructed because the car's hood was up.

Francis got into his car and followed. When he turned the corner, he saw the two robbers in what appeared to be a four door white or light colored Dodge or Chrysler car. The car, driven by a third person, immediately took off.[2] Francis followed, and the robber in the front passenger seat leaned out the window and fired approximately three shots at Francis that missed. Francis then saw the robber in the back passenger seat on the driver's side fire three more shots at him, hitting his windshield. Francis could not tell whether the front passenger passed his gun to the back passenger, or if the back passenger had his own gun. At that point, Francis stopped pursuing the robbers and returned to his house where he heard additional shots being fired nearby.

K.V. was visiting her mother's apartment on October 20, 2008, around the corner from Francis's house when a bedroom window was shot. K.V. heard about three shots fired. Officers recovered a .38-caliber bullet from inside the bedroom. Police were unable to locate any bullet casings near the scene.

---

[2] During cross examination, Francis said he could not really tell who was in the driver's seat of the car he was chasing.

A few days later, Francis saw defendant's and Lewis's photographs in the newspaper as suspects in a different robbery and reported to law enforcement that they appeared to be the two men who had robbed him. At trial, Francis identified Lewis as the man with the gun and defendant as the man who searched his pockets during the robbery.

Sometime around 12:30 a.m. on October 22, 2008, two Black men robbed William Y. of two cell phone devices while he was getting out of his car in his driveway. They stated something like, " 'Hey, where's your money nigga?' " as one of the men shoved a gun to his head and the other checked his pockets. At least one man wore a ski mask. When William said his money was in the bank, he was struck in the face and knocked unconscious. William testified the two men appeared "experienced" as they came at him from two separate directions around the car to surprise him.

Sometime between 12:30 and 1:30 a.m. on October 22, 2008, David W. was painting the inside of a house with the doors and windows open. He saw a masked face appear in the kitchen window, and then a masked man came around the corner pointing a revolver at David's chest while another masked man came down the hallway towards him. They demanded money and threatened to "smoke" or shoot him if he did not comply. David denied having any money, and the man without the gun checked his pockets. After stating, " 'This guy don't even have a dollar on him,' " the robbers threatened to take David's tools and cell phone instead. David told the men that they might as well shoot him if they took his tools or phone because that was how he made a living. The robbers popped the battery from David's cell phone and left.

David also saw the newspaper article with defendant's and Lewis's photographs and recognized them as the two men who robbed him. He called police and identified Lewis as the man with the gun and defendant as the man who checked his pockets during the robbery.

A few hours later on the morning of October 22, federal prison worker Michael Rutledge was found face-down on the lawn near his driveway, his wallet missing. The

6

door of his truck was open. He had been shot in the forehead while kneeling or lying on the ground. Rutledge suffered additional blunt force trauma to his head, trunk, and extremities, and died from the gunshot wound to his head.

Rutledge normally left for work around 5:00 a.m. Sometime between 4:21 a.m. and 4:35 a.m., neighbors heard a gunshot. Neither reported the shot because they often heard gunshots in Stockton. No casings were found at the scene. A waste management employee working that morning saw Rutledge lying face down and called police around 6:45 a.m.

Rutledge's wife testified that he carried no cash but that he carried a debit card and kept the pin number for the card on a slip of paper inside his wallet. Before 5:20 a.m., Rutledge's debit card was used to make two cash withdrawals of $180 each. A third attempt to use the card was denied because of the card's daily cash withdrawal limit. A few minutes later, a fourth attempt to withdraw cash at a truck stop was denied, but a $60 gas purchase went through. Subsequent attempts to use cards from Rutledge's wallet were unsuccessful.

Surveillance video from the truck stop where cards from Rutledge's wallet had been used showed a green Jeep Cherokee belonging to defendant. At the truck stop, two persons exited from the passenger side of the Jeep. One of the passengers, codefendant Bryant, used the ATM machine while inside the truck stop while the other passenger, codefendant Lewis, also entered the store and made a purchase. Surveillance video from a nearby bank taken a few minutes later showed Bryant attempting to withdraw money from the ATM using the victim's card.

Defendant's green Jeep was later observed parked in front of a house on South Orange Street, where Lewis and Bryant lived. While police were investigating the Jeep, Lewis opened the door to the house, struggled with police, and was arrested. During a subsequent home search, officers found a loaded .38 caliber handgun with a silver tip

with five live rounds and one empty chamber, the murder victim's wallet, ski masks, and William Y.'s two cell phone devices. Defendant was arrested later that same day.

Forensic analysis showed that the .9 millimeter shell casings recovered from defendant's Jeep in the July 2008 incident and the .9 millimeter shell casings recovered from three of the October 2008 crime scenes were fired from a single firearm. The .38 caliber bullet fired through K.V.'s apartment window had similar markings to the .38 caliber revolver recovered from Lewis's and Bryant's home. And at least one bullet fragment found in the murder victim also had similar markings and could have been fired from the .38 caliber revolver, although the criminalist could not definitively identify that specific gun as either the murder weapon or the weapon that fired the bullet through K.V.'s window. Phone records showed defendant's and Lewis's cell phones pinged off cell towers located near the victims' homes at the time of the various crimes.

Codefendant Bryant testified that in October 2008 she lived at the South Orange Street house with her young children, her teenaged niece, codefendant Lewis, his brother, and Lewis's mother; Bryant and Lewis's mother were dating at the time. Defendant lived next door to his grandmother. Defendant and Lewis were best friends and hung out all the time together. Bryant said the .38 caliber revolver found at the South Orange Street house belonged to Lewis and that she had seen defendant with a black .9 millimeter gun on a prior occasion in the summer of 2008 when she had dropped Lewis off at defendant's house.

Bryant said she and her children and Lewis's mother were in Elk Grove from October 15 to October 21, 2008. They went there because Lewis and his brother had beaten her up and threatened to kill her; she said Lewis had physically assaulted her on several occasions and "tormented" the rest of the household, including his own mother. Lewis had threatened to kill her on multiple occasions, choked her, pushed her through a window, and threw a closed soda can at her so hard that it exploded on both ends. Bryant wrote a letter dated October 17, 2008, describing the abuse and stating she was afraid of

8

Lewis because he carried a loaded gun and could kill someone, including her, if not stopped.

Bryant took defendant's green Jeep to Elk Grove and left her gold four door Dodge Stratus for defendant to drive. When Bryant returned to Stockton on the night of October 21, she picked defendant up at his house around 9:30 p.m. and they returned to the South Orange Street house together. Lewis and defendant then left the South Orange Street house together around 10:00 p.m. in defendant's Jeep. Bryant remained at the house with others and fell asleep around 3:00 a.m. When she awoke, defendant and Lewis were back; Lewis had a credit card, and defendant had a little white piece of paper in his hand.

Bryant said she and defendant and Lewis took the card and got into defendant's Jeep. They drove to a nearby gas station where defendant tried to use the card to buy gas and when that failed, defendant gave Bryant the card and a slip of paper with the PIN number. Using the card and the PIN number, Bryant withdrew money from the ATM inside the store. They went to another gas station where defendant used the card to buy gas. Defendant gave Bryant the card back and she tried to use it again inside the store. The trio then drove to a bank where Bryant tried to use the card, and then to defendant's house where they left the Jeep and switched to defendant's grandmother's van before returning to the South Orange Street house around 6:00 a.m. Bryant was still at home when police arrived later that day and struggled to subdue Lewis. She denied being present when Rutledge was shot and robbed.

On October 23, the day after Lewis was arrested, he was recorded during a jail visit saying he had bought the .38 caliber gun found at his house while he was jogging on the morning Rutledge was killed. During a jail visit on October 24, defendant asked an unknown woman to do him a favor; as he started to ask her, she told him not to say it out loud and then to "[l]ip it." Defendant responded, "[o]h, okay"; and in a very low, almost unintelligible voice, he then described the yard between his house and his grandmother's

9

house, and said there was a board and box covering something that he wanted the woman to retrieve from under there without letting anyone know. Despite recovering several .9 millimeter shell casings from multiple crime scenes that were all fired from the same gun, police were never able to locate a .9 millimeter gun during their investigation.

B.    *The Jury Verdicts and Sentencing*

The jury found defendant and Lewis guilty of the first degree murder of Rutledge during the commission or attempted commission of a robbery (count 1). (§§ 187, 190.2, subd. (a)(17)(a).) The jury found codefendant Bryant not guilty of the murder and robbery of Rutledge, but guilty of only the lesser included offense of receiving stolen property.

The jury found defendant and Lewis guilty of the premeditated and deliberate attempted murders of Cynthia B., Francis S., Peter C., and Javier G. (counts 5, 12, 20, 21), eight second degree robberies (counts 2, 4, 6, 8, 9, 11,16, 17), two attempted robberies as a lesser included offense (counts 7, 10), shooting at an inhabited dwelling (count 15), and residential burglary (count 18), among other offenses. The jury found true that defendant was armed with a firearm pursuant to section 12022, subdivision (a)(1) during several of the above offenses, including the murder and attempted murders. For counts 11, 12, and 15, the attempted robbery and attempted murder of Francis S. and shooting at an inhabited dwelling, the jury found not true that defendant had intentionally and personally discharged or personally used a firearm (§§ 12022.53, subds. (a)-(c), 12022.5, subd. (a)). Various firearm enhancements were also found true as to Lewis.

The trial court sentenced defendant and Lewis to life in prison without the possibility of parole for the murder, four life terms for the attempted murders, and determinate sentences totaling 17 years four months for defendant (later reduced by two years) and 40 years four months for Lewis.

10

Defendant and Lewis appealed. (*People v. Lewis et al.* (Apr. 30, 2015, C064781) [nonpub. opn.].) We reversed Lewis's criminal convictions for pretrial competency proceeding error, but affirmed defendant's judgment in full. (*Ibid.*)

C.    *The Petition for Resentencing*

In March 2021, defendant filed a petition for resentencing under former section 1170.95 (now section 1172.6). We reversed the trial court's denial of the petition at the prima facie stage. (*People v. Whatley* (Feb. 15, 2023, C095248) [nonpub. opn.].)

Upon remand, the trial court conducted an evidentiary hearing in October 2023. The trial court continued the matter for a ruling, and then requested supplemental briefing from the parties.

At the continued hearing in June 2024, the trial court denied the petition. Having reviewed the admitted trial evidence, the court found the prosecution had proven beyond a reasonable doubt that defendant could still be convicted of the murder and the four attempted murders under current law because the totality of the evidence showed defendant was a major participant who acted with reckless indifference to human life.

Defendant timely appealed.

## I. DISCUSSION

A.    *Legal Principles*

Effective January 1, 2019, Senate Bill No. 1437 (Senate Bill 1437) overhauled the state's murder statutes to more equitably sentence offenders according to their involvement in homicide offenses. (Stats. 2018, ch. 1015, § 1.) Senate Bill 1437 achieved this goal by amending section 188 to require that a principal act with express or implied malice (§ 188, as amended by Stats. 2018, ch. 1015, § 2), and by amending section 189 to state that a person can be liable for felony murder only if: (1) the "person was the actual killer"; (2) the person, with an intent to kill, was an aider or abettor in the commission of murder in the first degree; or (3) the "person was a major participant in the underlying felony and acted with reckless indifference to human life." (§ 189, subd.

11

(e), as amended by Stats. 2018, ch. 1015, § 3.)  These ameliorative changes eliminated murder based on the natural and probable consequences doctrine or other imputed malice theories based solely on a person's participation in a crime and narrowed the first degree felony murder rule.  (§ 188, subd. (a)(3) ["Malice shall not be imputed to a person based solely on his or her participation in a crime"]; *People v. Strong* (2022) 13 Cal.5th 698, 707 (*Strong*) [Senate Bill 1437 "significantly limited the scope of the felony-murder rule"].)  The Legislature has since expanded eligibility for relief to those convicted of attempted murder based on the natural and probable consequences doctrine.  (Stats. 2021, ch. 551, § 2 (Sen. Bill No. 775); § 1172.6, subd. (a).)

Individuals convicted under the former law may "seek retroactive relief under the law as amended" pursuant to section 1172.6 (formerly section 1170.95).  (*Strong, supra*, 13 Cal.5th at p. 708; see also *id.* at p. 708, fn. 2.)  Where, like here, the trial court issues an order to show cause and holds an evidentiary hearing, the prosecution bears the burden of proving, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to section 188 or 189 made effective by Senate Bill 1437.  (§ 1172.6, subd. (d)(3).)  The parties may offer evidence from a prior trial, or new or additional evidence at the hearing.  (*Ibid.*)

We review the denial of a section 1172.6 petition following an evidentiary hearing for substantial evidence.[3]  (*People v. Emanuel* (2025) 17 Cal.5th 867, 885 (*Emanuel*).)  "Our job on review is different from the trial judge's job in deciding the petition.  While the trial judge must review all the relevant evidence, evaluate and resolve contradictions,

---

[3] Defendant asserts, without any citation to authority, that we need not defer to the trial court's findings because it relied on the trial record and not live testimony at the evidentiary hearing.  We disagree.  (See *Emanuel, supra*, 17 Cal.5th at pp. 881, 885 [applying the substantial evidence standard of review to trial court's denial of a § 1172.6 petition following an evidentiary hearing where "[t]he parties relied on the original trial record [and] neither party presented new evidence"].)

and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finders' findings beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.)  We examine " 'the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657-658.)  "We do not reweigh the evidence or revisit credibility issues, but rather presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence." (*People v. Pham* (2009) 180 Cal.App.4th 919, 924-925.)  "Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 358.)

B.      *Murder Convictions*

Defendant contends the evidence is insufficient to show he personally killed Rutledge or that he aided and abetted Lewis with the intent to kill during the robbery.  We need not decide, however, whether sufficient evidence shows he killed, or intended to kill, Rutledge.

As the People correctly note, under current law defendant could still be guilty of Rutledge's murder if he was a major participant who acted with reckless indifference to human life during the robbery regardless of whether he actually killed Rutledge or had the intent to kill him.  (§ 189, subd. (e)(3); *Emanuel, supra*, 17 Cal.5th at p. 880.)  Here, the trial court specifically found based on the totality of the circumstances and beyond a reasonable doubt that defendant was a major participant who acted with reckless indifference to human life.  We conclude substantial evidence supports the court's findings.

13

When "Senate Bill 1437 amended . . . section 189 to incorporate major participation and reckless indifference requirements, it codified the understanding of those requirements elucidated in" *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). (*Strong, supra*, 13 Cal.5th at p. 710.) *Banks* and *Clark*, in turn, utilized *Tison v. Arizona* (1987) 481 U.S. 137 and *Enmund v. Florida* (1982) 458 U.S. 782 as "guideposts" to delineate the contours of the major participant and reckless indifference standards for felony murder.[4] (*Strong, supra*, at p. 705; *Emanuel, supra*, 17 Cal.5th at p. 882 [*Tison* and *Enmund* "articulate the constitutional limits of capital punishment for accomplices to felony murder"].)

*Banks* explained that when determining whether a defendant is a "major participant" in a felony murder, the jury may consider the defendant's role in the planning and criminal enterprise that led to death, the defendant's role in supplying or using weapons, his awareness of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants, whether the defendant was present at the scene of the killing, was in a position to facilitate or prevent the actual murder and whether his own actions or inactions played a particular role in the death, and what defendant did after lethal force was used. (*Banks, supra*, 61 Cal.4th at p. 803.) The *Banks* court found the evidence was insufficient to show the defendant there—a getaway driver for an armed robbery of a medical marijuana dispensary—was a major participant,

---

[4] On one end of the spectrum, the defendant in *Enmund* was not eligible for the death penalty where he drove accomplices to the victim's home for an armed robbery, remained in the car as the getaway driver, did not intend to kill, and was not present when the killing occurred. (*Enmund v. Florida, supra*, 458 U.S. at pp. 791, 801.) At the other end of the spectrum, the defendant in *Tison* was death-penalty eligible as a major participant who acted with reckless indifference to human life where he broke two convicted murderers out of prison, armed the escaped prisoners, captured and then held a family of passing motorists at gunpoint while the escapees deliberated whether to kill them, and then abandoned the victims in the dessert after the escapees shot them. (*Tison v. Arizona, supra*, 481 U.S. at pp. 151-152.)

14

where there was no evidence establishing his role in planning the robbery or procuring weapons, and no evidence he was present for the robbery or played a role in instigating the shooting. (*Id.* at pp. 794-795, 805, 807-808.)

When deciding whether a defendant acted with "reckless indifference to human life" under *Clark*, the jury may consider the use and number of weapons and the defendant's knowledge of them, the defendant's physical presence at the scene of the killing and opportunities to stop the crime or aid the victim, the duration of the felony, the defendant's knowledge that his criminal partner was likely to kill, and the defendant's effort to minimize the risk of the felony. (*Clark, supra*, 63 Cal.4th at pp. 618-623.) In *Clark*, our Supreme Court found the evidence was insufficient to show the defendant there acted with reckless indifference to human life in the armed robbery of a computer store, where he planned the robbery but was not armed or physically present in the store when the victim was shot, did not have the intent to kill, and attempted to minimize the likelihood of violence by timing the robbery for a time when fewer people would be present and using an unloaded gun. (*Id.* at pp. 611, 618-623.)

No one of the *Banks* or *Clark* factors "is necessary, nor is any one of them necessarily sufficient" to establish a defendant was a major participant or acted recklessly indifferent to a grave risk of death during an offense. (*Banks, supra*, 61 Cal.4th at p. 803; *Clark, supra*, 63 Cal.4th at p. 618.)

In this case, defendant does not challenge the trial court's finding he was a major participant in the crimes. Instead, he argues insufficient evidence shows he acted with reckless indifference to human life because there was no evidence he knew Lewis intended to shoot Rutledge or that he shared Lewis's intent to kill. We therefore focus our inquiry on whether the record contains substantial evidence to support the trial court's reckless indifference finding. Viewing the totality of the evidence in the light most favorable to the trial court's order (*Emanuel, supra*, 17 Cal.5th at p. 885), we conclude it does.

15

Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' " (*Clark, supra*, 63 Cal.4th at p. 616.) It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Id.* at p. 617.) Recklessness has both a subjective and an objective component. (*Ibid.*) Subjectively, the defendant must consciously disregard risks known to him. (*Ibid.*) Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' " (*Ibid.*) "[P]articipation in a ' "garden-variety armed robbery," ' i.e., one in which the only factor supporting a reckless indifference finding is that a participant was armed with a gun, is insufficient without more to establish reckless indifference." (*Emanuel, supra*, 17 Cal.5th at p. 884; see also *In re Scoggins* (2020) 9 Cal.5th 667, 677 [" 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life"].)

According to defendant, Rutledge's shooting was nothing more than "Lewis's spontaneous act on his own." He claims there was no evidence he supplied or used a gun in any of the shootings, and any awareness that Lewis had a gun, without more, is insufficient to establish reckless indifference. He also notes that during the crime spree preceding Rutledge's killing, he told Lewis, "let's go" when Francis S. could not tell them his PIN number, and that Peter C. was unsure whether the shots were fired at him or in the air as a warning. He further argues Lewis shot Javier G. while he robbed another victim in the backyard, giving him no meaningful opportunity to restrain Lewis prior to the shooting.

The trial court did not specifically address the duration of the crime, but it is reasonable to infer that Rutledge's contact with defendant and Lewis was relatively short.

16

(See *In re Bennett* (2018) 26 Cal.App.5th 1002, 1024 [minutes-long encounter described as "negligible" in concluding duration of felony did not increase risk of violence beyond that inherent in the crime].) Defendant's and Lewis's other numerous robberies prior to Rutledge's killing only lasted a few minutes. And the evidence showed Rutledge was packing his car to leave for work sometime before 5:00 a.m., the neighbors heard the gunshot between 4:21 a.m. and 4:35 a.m., and defendant and Lewis were using Rutledge's credit cards by 5:19 a.m. Despite the fact this *Clark* factor does not weigh in favor of finding reckless indifference, the remaining factors do. (*Clark, supra*, 63 Cal.4th at p. 618 [not all *Clark* factors are necessary to find a defendant acted with reckless indifference].)

Regarding the first factor—knowledge of a cohort's likelihood of killing and the use of or awareness of the presence of weapons—the evidence overwhelmingly showed Lewis was extremely violent and often impulsively attacked others and that defendant was aware of his propensity for violence. Lewis accosted his own mother and pushed codefendant Bryant though a window and choked her. He also threw a closed soda can at Bryant so hard that the can exploded at both ends on impact. Lewis physically assaulted Bryant on October 15—about a week before Rutledge was killed—prompting Bryant to flee to Elk Grove. Bryant was so scared of Lewis after the attack that she wrote a letter explaining her fear of Lewis and warning that he had a gun (the .38 caliber revolver recovered from Lewis's and Bryant's home on South Orange Street) and would likely kill someone if not stopped. Because defendant and Lewis were best friends and hung out together all the time at Lewis's home, a reasonable trier of fact could infer that defendant knew of Lewis's violent nature and his repeated physical assaults on others. Indeed, the week before Rutledge was killed defendant traded his own car with Bryant so she could leave town after Lewis had beaten her up.

Defendant also knew Lewis had access to loaded firearms and knew he was likely to use those firearms during a robbery. This knowledge was based on the circumstances

17

of the multiple robberies that defendant and Lewis had carried out together in the days preceding Rutledge's robbery and murder. For example, defendant and Lewis were arrested together in July 2008 after Lewis pointed a gun at a woman while defendant was driving Lewis in his Jeep. Further, Margarito L. testified that both men who robbed him on October 16 pointed guns at him and that both men physically attacked him, demonstrating both Lewis's and defendant's propensity for violence.[5] Moreover, Cynthia B. testified that upon seeing two men trying to get into a parked car in the alleyway behind Margarito's house the night he was robbed, one of the men yelled, " 'Shoot her. Shoot her,' " and shots were immediately fired. Police recovered a .9 millimeter shell casing from the alley. Although the jury only found defendant was "armed" during the attempted murder of Cynthia B., the trial court reasonably could infer that defendant was the male voice who encouraged Lewis to shoot Cynthia, and that Lewis fired upon her in response to defendant's encouragement.

Another act of violence revealed by the record is the robbery at Baltazar's house. There, a neighbor identified defendant as present during the crime. This testimony further demonstrated Javier G. was shot in the stomach while being robbed and while defendant himself was actively engaged in robbing one of Javier's friends. Defendant was also present when Lewis shot at Peter C. and Francis S. after they had robbed both men.

Defendant's participation with Lewis in each of these near fatal crimes only a few days before their deadly encounter with Rutledge gave defendant direct personal

---

[5] The indictment did not allege any firearm enhancements against defendant related to Margarito's robbery. Although Margarito testified that both men had guns, the jury was never asked to decide whether defendant was armed with or used a gun during the robbery.

knowledge of Lewis's dangerousness and volatility, his access to loaded weapons, and his demonstrated willingness to use those weapons while robbing victims *with* defendant.

Defendant's claim there was "no evidence" he supplied or used a firearm in any of the shootings is misleading. We note Francis testified that both robbers fired three shots each at him while he pursued them in his car, either by passing a gun between them or by both having their own guns, but the jury found true that defendant was armed and not true that he had intentionally and personally discharged or personally used a firearm during the Francis robbery. As noted above, Margarito testified that both assailants had firearms when they robbed and beat him. The record also shows that although the .38 caliber revolver was found at Lewis's house, defendant had been seen with a .9 millimeter gun in the summer of 2008 a few months before Rutledge was killed, each of the .9 millimeter shell casings recovered at the crime scenes (and in defendant's car) were fired from a single gun, immediately after being arrested defendant asked an unidentified jail visitor to secretly retrieve an object he had hidden at his house prior to his arrest, and the .9 millimeter gun was never found. From this evidence, the trial court could reasonably infer defendant had the .9 millimeter gun that was used during several of the robberies, that he at least supplied the gun to Lewis to use during the crimes, and that he had someone get rid of it for him so police could not find the gun.

Regarding the next factor—minimizing the risk of violence—substantial evidence shows defendant made no efforts to minimize the risk of violence when robbing Rutledge. While *In re Scoggins, supra*, 9 Cal.5th at page 683 teaches that a planned unarmed assault and robbery that is set to "take place in a public parking lot during the daytime, when the possible presence of witnesses might reasonably be thought to keep [the defendant's] accomplices within the bounds of the plan" may tend to minimize the risk of lethal violence, that is not what occurred here.

Rather than robbing people in public in broad daylight, defendant's and Lewis's modus operandi was to work in unison to attack unsuspecting victims with loaded

19

firearms when they were most vulnerable—while they were alone in their driveways or homes either late at night or very early in the morning. These circumstances heightened the possibility that no witnesses would be present to otherwise keep Lewis within the bounds of a plan to not seriously harm the victims. (Compare *Emanuel, supra*, 17 Cal.5th at p. 889 ["where a defendant plans to commit an unarmed robbery of a marijuana dealer at a public park in the middle of the afternoon, the objective risk of violence posed by the crime and reasonably anticipated by the perpetrator is far less grave"].)

The last of the *Clark* factors—physical presence at the scene and opportunity to restrain the violence or aid the victim—also supports the trial court's reckless indifference finding. "Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the [co-]participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force." (*Clark, supra*, 63 Cal.4th at p. 619.) On the day Rutledge was robbed and murdered, defendant and Lewis had already carried out two other armed robberies together. During one of those robberies, William Y. had a gun shoved to his head and then was knocked unconscious after being violently struck in the head and face. During the other, the man pointed a gun at the victim's chest and told him they would shoot or "smoke" him if he did not give them money. Assuming Lewis was the gunman, defendant was aware that Lewis was armed and willing to inflict potentially lethal violence on their victims only hours before they robbed Rutledge.

The evidence showed Rutledge suffered blunt force trauma on his body before being shot in the head execution-style while he was kneeling or near the ground. No evidence demonstrates defendant took any steps to help Rutledge during the beating or once he had been shot in the head. Instead, defendant left Rutledge to die alone on his front lawn in the early morning hours while his family slept just feet away inside their

20

house.  Defendant and Lewis then fled back to the South Orange Street house where they picked up Bryant and used Rutledge's credit cards within an hour of murdering him.

The totality of the evidence supports the trial court's findings beyond a reasonable doubt that defendant was a major participant who acted with reckless indifference to human life during the robbery and murder of Rutledge.

C.      *Attempted Murders*

Defendant asserts the trial court erred in declining to vacate his four attempted murder convictions because the jury instructions are ambiguous as to whether the jury found he personally had an intent to kill, and insufficient evidence shows he had such an intent.  We disagree.  Defendant's jury did not convict him of attempted murder based on the natural and probable consequences doctrine but instead necessarily found he had the intent to kill.

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing."  (*People v. Lee* (2003) 31 Cal.4th 613, 623, superseded by statute on other grounds as stated in *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 824; *People v. Smith* (2005) 37 Cal.4th 733, 739.) For purposes of the offense, "[i]ntent to unlawfully kill and express malice are, in essence, 'one and the same.' " (*Smith, supra*, at p. 739.)  At the time of defendant's trial, the jury either had to find defendant harbored express malice or it had to impute such malice to him under a theory such as the natural and probable consequences doctrine. Section 1172.6 has since abrogated the natural and probable consequences theory of liability for attempted murder.  (§ 1172.6, subd. (a).)

Under the natural and probable consequences doctrine, an aider and abettor may be culpable for a nontarget, or unintended, offense committed while committing a target offense.  (*People v. Favor* (2012) 54 Cal.4th 868, 874, superseded by statute on other grounds as stated in *People v. Hin* (2025) 17 Cal.5th 401, 442 [" ' "a defendant who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target

21

offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime" ' "].) "By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target crime." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 852.)

Here, as the People correctly note, the trial court instructed the jury on direct perpetrator liability and direct aider and abettor liability—each of which required defendant to have a specific intent to kill. Because the jury was *not* instructed on a natural and probable consequences theory of attempted murder, defendant legally was not entitled to relief on those counts. (*People v. Coley* (2022) 77 Cal.App.5th 539, 548 [section 1172.6 "applies by its terms only to attempted murders based on the natural and probable consequences doctrine"].)

The trial court instructed the jury with CALCRIM former No. 400, on the general principles of aiding and abetting, and with CALCRIM No. 401, on the theory of direct aiding and abetting an intended crime. (See *People v. Coley, supra*, 77 Cal.App.5th at p. 548 ["[d]irect aiding and abetting remains a valid theory of attempted murder after the enactment of Senate Bill No. 775"].) Importantly, the jury *was not* instructed with CALCRIM Nos. 402 and 403, which contain the instructions on aiding and abetting based on the natural and probable consequences doctrine.

The former version of CALCRIM No. 400 as given here provided, "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who

committed it." CALCRIM No. 401, in turn, instructed the jury that to prove defendant guilty of a crime based on aiding and abetting that crime, the People had to prove the perpetrator committed the crime, defendant knew that the perpetrator intended to commit the crime, before or during the commission of the crime defendant intended to aid and abet the perpetrator in committing the crime, and defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

Defendant cites the *equally guilty* language in CALCRIM former No. 400 as contributing to the instruction's supposed ambiguity regarding defendant's required intent. But, in *People v. Johnson* (2016) 62 Cal.4th 600, our Supreme Court held that where CALCRIM No. 401 is also provided, like it was here, "there was no reasonable likelihood the jurors would have understood the 'equally guilty' language in CALCRIM former No. 400 to allow them to base defendant's liability for first degree murder on the mental state of the actual shooter, rather than on defendant's own mental state in aiding and abetting the killing." (*Johnson, supra*, at p. 641.)

The trial court also instructed the jury with CALCRIM No. 600, which advised defendant's jury that an attempted murder conviction required a finding that "the defendant took at least one direct but ineffective step toward killing another person"; and "the defendant intended to kill [the victim]." "A direct step," the jury was told, "indicates a definite and unambiguous intent to kill." The court then gave CALCRIM No. 601, which informed the jury that if it found defendant guilty of attempted murder, it had to decide whether the People had proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation. That instruction told the jury that "[a] defendant acted willfully if he intended to kill when he acted. A defendant deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. A defendant premeditated if he decided to kill before acting."

Based on the instructions given, the jury found defendant guilty of four counts of attempted murder and found true the attached allegations that defendant committed the attempted murders willfully, with deliberation and premeditation, as those terms were defined in CALCRIM No. 601. Defendant was not found guilty of the first degree attempted murders based on the natural and probable consequences doctrine because the jury was not instructed on that doctrine and the jury necessarily found defendant himself acted with an intent to kill.[6] This renders him ineligible for relief under section 1172.6. (*People v. Coley, supra*, 77 Cal.App.5th at p. 548.) While the trial court did not cite the absence of a natural and probable consequences instruction in addressing the attempted murder counts,[7] we may affirm the court's order if its decision is correct on any grounds applicable to the case. (*Pasadena Medi-Center Associates v. Superior Court* (1973) 9 Cal.3d 773, 779, fn. 6 [if a trial court's decision is correct on any theory of law applicable to the case, the appellate court will affirm the judgment, whether the trial court's reasons were correct or not].)

---

[6] Defendant's reliance on *People v. Langi* (2022) 73 Cal.App.5th 972 is misplaced. The *Langi* court held that CALJIC Nos. 3.01 and 8.31 were "inadequate as applied to the crime of second degree murder because [they] did not clarify that an accomplice must personally harbor that mental state of implied malice." (*Langi, supra*, at p. 983.) But defendant here was not convicted of second degree murder. At issue here are defendant's four convictions for attempted premeditated murder where no natural and probable consequences instruction was given. Under those circumstances, *Langi* is inapposite. (*People v. Casper* (2004) 33 Cal.4th 38, 43 ["It is axiomatic that cases are not authority for propositions not considered"].)

[7] We decline to find the People forfeited their argument that defendant is ineligible for relief as a matter of law on the attempted murder counts. At the continued evidentiary hearing, the prosecution did note that "there was no natural and probable consequences" theory given at trial, although counsel mistakenly characterized the argument as "moot" at that stage of the proceedings. In any event, we may find the forfeiture doctrine inapplicable where a case presents a pure legal question like the one here. (*People v. Yeoman* (2003) 31 Cal.4th 93, 118.)

*D.*	*Fees and Fines*

Defendant finally challenges restitution fines and fees and a court security fee originally imposed at sentencing.  He argues imposing these financial obligations without first determining his ability to pay violated his right to due process, and that his counsel was ineffective for failing to object.  These claims are not cognizable in the present appeal from the trial court's denial of defendant's resentencing petition.

" 'Section 1172.6 does not create a right to a second appeal, and [defendant] cannot use it to resurrect a claim that should have been raised in his [direct] appeal.' " (*People v. Berry-Vierwinden* (2023) 97 Cal.App.5th 921, 936; see also *People v. Farfan* (2021) 71 Cal.App.5th 942, 947 ["The mere filing of a section [1172.6] petition does not afford the petitioner a new opportunity to raise claims of trial error"].)  Thus, defendant cannot raise his fee-related claims in this appeal.

### III.  DISPOSITION

The order denying defendant's section 1172.6 petition is affirmed.


/S/

_____

RENNER, J.



We concur:


/S/

_____

EARL, P. J.


/S/

_____

FEINBERG, J.


25